# UNITED STATES BANKRUPTCY COURT
## EASTERN DISTRICT OF KENTUCKY
### ASHLAND, LONDON, AND LEXINGTON DIVISIONS

IN RE:                                                           CHAPTER 7

**LICKING RIVER MINING, LLC,** *et al.*                          **CASE NO. 14-10201**

**DEBTORS**                                                      **JOINTLY ADMINISTERED**

_____

**PHAEDRA SPRADLIN, CHAPTER 7**              **PLAINTIFF**
**TRUSTEE OF THE DEBTORS'**
**ESTATES**
                                             **ADV. CASE NO. 15-1004**
**v.**

**EAST COAST MINER, LLC,** *et al.*          **DEFENDANTS**

---

### MEMORANDUM OPINION AND ORDER GRANTING IN PART AND DENYING IN PART MOTIONS FOR SUMMARY JUDGMENT REGARDING TRUSTEE'S BREACH OF FIDUCIARY DUTY CLAIM AGAINST GOGGIN AND GOODWIN

This matter is before the Court on Motions for Summary Judgment filed by Plaintiff

Phaedra Spradlin, Chapter 7 Trustee of the Debtors' Estates ("Trustee") [ECF No. 199

("Trustee's Motion")],[1] Defendant Keith Goggin [ECF No. 191 ("Goggin's Motion)"], and

Defendant Michael Goodwin [ECF No. 192 ("Goodwin's Motion")].[2]  All three Motions were

fully briefed and supported by voluminous exhibits, and the Court held lengthy oral

argument.  This Opinion pertains only to Trustee's breach of fiduciary duty claim against

Defendants (Count 7 of Trustee's First Amended Complaint [ECF No. 63]).

---

[1] "Debtors" are U.S. Coal Corporation ("U.S. Coal"), Licking River Mining, LLC ("LR Mining"), Licking River Resources, Inc. ("LR Resources"), S.M.&J., Inc. ("SMJ"), Fox Knob Coal Co., Inc. ("Fox Knob"), J.A.D. Coal Company, Inc. ("JAD"), Harlan County Mining, LLC ("Harlan"), Oak Hill Coal, Inc. ("Oak Hill"), Sandlick Coal Company, LLC ("Sandlick"), and U.S. Coal Marketing, LLC ("USC Marketing").

[2] Collectively, Goggin and Goodwin will be referred to as "Defendants" and Goggin's Motion and Goodwin's Motion will be referred to as "Defendants' Motions."

## JURISDICTION

This Court has jurisdiction over this adversary proceeding. 28 U.S.C. § 1334(b). Venue is proper in this District. 28 U.S.C. § 1409.

Bankruptcy courts may "hear and determine . . . all core proceedings arising under title 11 . . . and may enter appropriate orders and judgments, subject to review under section 158 of this title." 28 U.S.C. § 157(b)(1). Examples of "core proceedings" are set out in 28 U.S.C. § 157(b)(2). Bankruptcy courts also may hear non-core proceedings that are related to cases under title 11 but, absent party consent, may not finally resolve them. Instead, bankruptcy courts must submit proposed findings of fact and conclusions of law to the district court. 28 U.S.C. § 157(c)(1). Alternatively, parties may consent to a bankruptcy court's entry of final orders. 28 U.S.C. § 157(c)(2).

Defendants have not consented to this Court's entry of final orders. [ECF No. 137.] In addition, Trustee's breach of fiduciary duty claim against Defendants is not a core claim. *See, e.g.*, *Kravitz v. Summersett (In re Great Lakes Comnet, Inc.)*, 586 B.R. 718, 721 (Bankr. W.D. Mich. 2018) (stating that breach of fiduciary duty claim "does not arise under the Bankruptcy Code or in a case under the Bankruptcy Code" but rather arises under state law, and "is also not a proceeding that can arise solely in the context of a bankruptcy case, because the claim may be pursued without the prerequisite of a bankruptcy filing;" therefore, the claim "does not constitute a core proceeding."); *see also Official Comm. of Unsec'd Creds. of Appalachian Fuels, LLC v. Energy Coal Res., Inc. (In re Appalachian Fuels, LLC)*, 472 B.R. 731 (E.D. Ky. 2012) (discussing core and non-core proceedings following *Stern v. Marshall*, 564 U.S. 462 (2011)). Thus, to the extent that the Court concludes that a summary judgment should be awarded, the

Court's disposition of Count 7 will constitute non-final proposed findings of fact and conclusions of law under 28 U.S.C. § 157(c)(1).

**PERTINENT UNDISPUTED FACTS**

The following discussion identifies undisputed facts that provide preliminary information to introduce the parties and some of the challenged transactions. Most of the undisputed facts upon which the Court relies to resolve the Motions are set forth in the legal analyses below.

**1.** **General background.**

U.S. Coal, a Delaware corporation, was formed on June 23, 2006. In January 2007, Robert Gabbard became the Chief Executive Officer of U.S. Coal and joined its Board of Directors.[3] U.S. Coal had many directors over time as reflected on the following chart:

| U.S. Coal Board of Directors | | |
|---|---|---|
| **Name** | **Term Began** | **Term Ended** |
| Collins, John | Sept. 30, 2011 | March 11, 2015 |
| Douglas, Karl | 2007 | Oct. 1, 2009 |
| Gabbard, Robert | Jan. 2007 | May 6, 2011 |
| Goggin, Keith | Oct. 1, 2009 (on or about) | Feb. 3, 2014 |
| Goodwin, Michael | Oct. 1, 2009 (on or about) | Oct. 23, 2012 |
| Koutsodimitropoulos, Dennis | Aug. 2008 | No earlier than Dec. 9, 2014 |
| Whitt, John | Jan. 5, 2007 | No earlier than bankruptcy |

Shortly after its formation, U.S. Coal acquired a mining operation referred to as the Licking River Division (the "LR Division"), comprised of LR Mining, LR Resources, SMJ, and Oak Hill and located in Magoffin County, Kentucky, from John Whitt, Kenneth Whitt, John Collins, and their families (the "LR Sellers"). U.S. Coal financed the acquisition in part by issuing a total of $10 million in promissory notes to the LR Sellers.

---

[3] The U.S. Coal Board of Directors as a body, without reference to a specific set of directors, is generally referred to herein as the "Board."

In early June 2007, two investment funds (CAMOFI Master LDC and CAMHZ Master LDC (the "CAM Entities")) purchased about $4.5 million of U.S. Coal's preferred stock and warrants to purchase common stock. Shortly thereafter, via a preliminary agreement dated June 19, 2007, U.S. Coal contracted to purchase another group of companies referred to as the "JAD Division" (comprised of JAD, Harlan, Fox Knob, and Sandlick) and owned by the Dean and McAfee families (the "JAD Sellers"). As of April 15, 2008, U.S. Coal acquired the stock of the JAD Division entities. JAD issued convertible notes to the JAD Sellers totaling $7 million (the "JAD Seller Notes"), with $6 million secured by a lien on the JAD Division entities' assets.

In association with the JAD Division acquisition, the CAM Entities made two loans. The first was a $4.8 million loan for equipment that the CAM Entities owned and sold to U.S. Coal and the JAD Division, in return for which CAMOFI Master LDC received a convertible promissory note issued by JAD (the "CAM Equipment Note"). The second was a $5 million bridge loan ("CAM JAD Bridge Notes") comprised of several notes issued by JAD, Fox Knob, and Sandlick to Lawrence Kaplan, Michael Miller, Futurtec, and the CAM Entities, all dated April 15, 2008. U.S. Coal guaranteed all of these Notes.

## 2. Goodwin and Goggin.

Goggin and Goodwin became equity investors in U.S. Coal in 2008 by purchasing common and preferred stock. In December 2008 and January 2009, U.S. Coal borrowed $4.5 million from various parties, including Goodwin, Goggin, and CAMOFI Master LDC, and issued unsecured promissory notes totaling $4.5 million (the "2008 Bridge Notes").

## 3. ECM is formed and acquires U.S. Coal debt.

In March 2008, JMB Capital Partners Master Fund ("JMB") acquired significant outstanding debt that U.S. Coal owed to another lender. Then, in August 2008, U.S. Coal and

4

JMB entered into a Second Amended and Restated Credit Agreement (the "JMB Credit Agreement"), as well as a separate Value Right Agreement ("VRA") made effective April 15, 2008. U.S. Coal's obligations to JMB under those agreements matured on September 30, 2009, and March 31, 2010, respectively. From late 2008 into the third quarter of 2009, U.S. Coal sought replacement financing for the JMB Credit Agreement and VRA.

Goggin and Goodwin had interest in acquiring JMB's positions. They negotiated concurrently with JMB to acquire its positions and with U.S. Coal to enter into a new credit agreement. On September 11, 2009, Goggin sent an email to Gabbard and John Wolff, U.S. Coal's respective CEO and CFO at the time, and others, with the outline of a proposed transaction:

> The JMB Notes and Value Right would be acquired by a third party in a transaction similar to the one currently proposed by [another potential lender]. The terms of the combined securities would be modified to suit the new owners. Face value on the amended note and value right would be the outstanding balance as of September 30, 2009. The model from last week listed this as $24.01 million. …

[ECF No. 204-4 at 2.] To carry out this transaction, East Coast Miner, LLC ("ECM") was formed under Delaware law on September 28, 2009. Effective September 30, 2009, ECM acquired JMB's interests under both the JMB Credit Agreement and the VRA for $18 million. As part of that transaction, ECM and U.S. Coal, LR Resources, Oak Hill, SMJ, JAD, Fox Knob, and Sandlick entered into the First Amendment to Second Amended and Restated Credit Agreement and Value Right Agreement (the "ECM Credit Agreement"), which refinanced the amounts previously owed to JMB and terminated the VRA.

Goggin was ECM's sole manager at all relevant times. Goggin and Goodwin were among the direct investors in and members of ECM. Director Dennis Koutsodimitropoulos was the designated representative of an entity that directly invested in ECM. In addition, several

members of Debtors' management (including directors John Collins, Robert Gabbard, and John Whitt) invested in ECM indirectly via ownership interests in a separate entity, U.S. Coal Management, LLC ("USCM"), which was organized in Kentucky on September 29, 2009. On September 30, 2009, U.S. Coal transferred $800,000 to USCM—$100,000 for each of eight members of Debtors' management and/or Board. All but two also invested an additional $100,000 of their own funds into USCM. USCM then invested this $1.4 million into ECM.

At the time of the ECM transaction, the Board had four directors: John Whitt, Robert Gabbard, Karl Douglas, and Dennis Koutsodimitropoulos. During its October 1, 2009 meeting, the Board approved Douglas' resignation, leaving Gabbard, Whitt, and Koutsodimitropoulos as directors. During that same meeting, the Board approved the ECM transaction and ratified all actions taken by the directors, officers, and representatives of U.S. Coal regarding the ECM transaction. The Board also approved an expansion from four to five members and the addition of Goggin and Goodwin to the Board "effective upon the closing of the proposed transaction with ECM … as the designees of ECM…." [ECF No. 197-17.] At the next U.S. Coal Board Meeting on October 13, 2009, Goggin moved to ratify and approve the $800,000 transfer from U.S. Coal to USCM, which was seconded and unanimously approved.

**4. Gabbard resigns and receives a severance agreement.**

Gabbard tendered a written resignation from his membership on the Board and from his employment with U.S. Coal and the other Debtors effective May 6, 2011. At a meeting on May 12, 2011, the Board unanimously accepted his resignation. On this date, the Board also unanimously approved a Separation Agreement and General Release with Gabbard (the "Severance Agreement") pursuant to which U.S. Coal agreed to make severance payments to

Gabbard. In addition, at that meeting, the Board appointed John Collins to fill Gabbard's role as U.S. Coal's CEO effective May 6, 2011. Collins later replaced Gabbard as a director.

**5.      U.S. Coal seeks to refinance debt but does not reach an agreement with Macquarie.**

Throughout 2010 and 2011, Debtors searched for global financing to consolidate all of U.S. Coal's debt into a single senior secured loan. U.S. Coal contacted potential lenders and progressed as far as executing non-binding term sheets. In Spring 2011, U.S. Coal enlisted Credit Suisse, an investment bank, to try to syndicate a comprehensive refinancing of its debt. Despite contacting multiple banks, Credit Suisse did not receive many orders for the syndication. By August 5, 2011, U.S. Coal was aware that Credit Suisse would not go forward with the proposed financing.

U.S. Coal also communicated with an Australian bank, Macquarie Bank Limited ("Macquarie"), in August 2011. On August 4, 2011, Macquarie provided an outline of a proposed financing structure to U.S. Coal. On August 22, 2011, Macquarie sent U.S. Coal a proposal for potential financing which included a refinancing offer of $95 million at an effective rate of under 8%. That term sheet listed seventeen conditions precedent including "[e]stablishment of a seven-member Board of Directors that consists of 3 independent Board members." [ECF No. 195-2 at 14-15.] A Macquarie loan would have refinanced the ECM Credit Agreement and virtually all other U.S. Coal debt.

On August 22 and 23, 2011, the U.S. Coal Board and management discussed concerns and changes to the Macquarie term sheet via email amongst themselves and with their counsel, Nixon Peabody LLP. Nixon Peabody noted potential concerns about certain fees and Macquarie's proposal to expand the Board. Nixon Peabody prepared a mark-up of the Macquarie term sheet based on comments from U.S. Coal's management and Board. While

other revisions were offered, the only one of Macquarie's seventeen conditions that was removed was the requirement of independent directors. On August 23, 2011, Wolff forwarded U.S. Coal's revisions to the Macquarie proposal to Macquarie's representative, Donald Carrillo. Carrillo responded to Wolff on August 23, 2011, stating: "We have some significant issues now separating us. I will send you a list separately." [ECF No. 195-6.] On August 24, 2011, Carrillo sent an email identifying several issues with U.S. Coal's changes, writing: "[t]he independent board members are a requirement for us to move forward." [ECF No. 233-9 at 2.] In follow-up correspondence, Carrillo asked if the Board expansion was going to be an issue and Wolff responded: "It is a problem." [ECF No. 195-9 at 1.] On August 25, 2011, Wolff conveyed the Board's decision to a representative of the CAM Entities: "I just told Macquarie the Board wasn't willing to add independents so that deal is now dead as well." [ECF No. 195-10.]

**6.      ECM II is formed and provides financing.**

After the Macquarie Proposal did not result in an agreement, Debtors continued to search for other financing. Michael Windisch replaced Wolff as U.S. Coal's Chief Financial Officer in September 2011. Goggin proceeded to organize East Coast Miner II, LLC ("ECM II") on October 25, 2011. Goggin and Goodwin were the only U.S. Coal insiders to invest in ECM II.

U.S. Coal, through CFO Windisch and CEO Collins, negotiated with ECM II for a loan to pay off the CAM JAD Bridge Notes. Initially, ECM II proposed a 20% interest rate for the loan. U.S. Coal, negotiating through Windisch, requested that ECM II, negotiating through Goggin, accept an 18% rate and later suggested a 15% rate. As evidenced by the Credit Agreement executed as of December 7, 2011 (the "ECM II Credit Agreement"), ECM II agreed to lower the interest rate to 18% only, with a 5% default interest provision.

On November 23, 2011, the Board voted to approve the ECM II transaction. Goggin and Goodwin abstained from voting. Collins, Whitt, and Koutsodimitropoulos approved the transaction. The ECM II transaction closed on December 7, 2011. ECM II loaned a total of $6,729,422.60. Of that amount, ECM II loaned $1,322,406.38 to U.S. Coal to pay the 2008 Bridge Notes, except for those held by Goggin and Goodwin, and $5,407,016.22 to JAD, Fox Knob, and Sandlick to pay the CAM JAD Bridge Notes. Goodwin and Goggin's 2008 Bridge Notes were amended and restated a second time as part of the ECM II transaction, including an extension of the maturity date.

**7.    Goodwin declares his personal note in default, and Goodwin and Goggin's personal notes are restructured.**

On October 22, 2012, U.S. Coal was in default under both the Goggin and Goodwin 2008 Bridge Notes (as amended and restated) and Goodwin served U.S. Coal with notices of default. He resigned from the U.S. Coal Board the next day.[4] Goggin neither served a notice of default nor resigned from the Board.

In advance of negotiations between U.S. Coal and Goodwin, Goggin advised Collins and Windisch that he would agree to accept any terms negotiated with Goodwin for the satisfaction of Goodwin's 2008 Bridge Notes. Collins and Windisch negotiated with Goodwin to refinance his 2008 Bridge Notes. Goggin communicated with U.S. Coal's representatives about these negotiations while they were ongoing.

At a special meeting on February 11, 2013, the Board held a vote to approve a refinance of Goodwin and Goggin's unsecured 2008 Bridge Notes into one secured note for each. Goggin

---

[4] Goodwin tendered evidence that he verbally resigned during a call on October 19, 2012, prior to giving written notice. The Court concludes that, for the reasons explained herein, whether Goodwin resigned on October 19 or 23 is not a material issue of fact with respect to the resolution of Goodwin's Motion.

abstained from voting. Collins, Koutsodimitropoulos, and Whitt were the other members of the Board at the time. Whitt and Collins voted to approve the transaction. Koutsodimitropoulos did not vote.

**8.     U.S. Coal loses its line of credit.**

As of February 2014, U.S. Coal had a long-standing line of credit provided by Commercial Bank from which it paid operating expenses. In connection with the line of credit, U.S. Coal's other lenders agreed to be subordinated to Commercial Bank's interests, which Commercial Bank required as a condition of its financing. Commercial Bank allowed the subordination agreement to lapse.

In January 2014, while Goggin was still a director of U.S. Coal, Commercial Bank asked ECM to agree to again subordinate its interests to those of Commercial Bank but, on ECM's behalf, Goggin refused. Goggin then resigned as a Director of U.S. Coal on February 3, 2014. Commercial Bank terminated U.S. Coal's line of credit on or about February 25, 2014. The termination of this line of credit led U.S. Coal to have to repay millions of dollars to Commercial Bank from its cash reserves. U.S. Coal also stopped paying most of its trade obligations, which ballooned in 2014.

**9.     Debtors' bankruptcies commence.**

On May 22, 2014, certain of LR Mining's creditors filed an involuntary chapter 11 petition against it. Involuntary petitions against LR Resources, Fox Knob, SMJ, and JAD followed shortly thereafter. On June 10, 2014, an involuntary petition was filed against U.S. Coal. The remaining four Debtors filed voluntary chapter 11 petitions on November 4, 2014.

## SUMMARY JUDGMENT STANDARD

Summary judgment should be granted when the evidence, construed in the light most favorable to the non-movant, confirms that there is no genuine issue of material fact and the movant is entitled to a judgment as a matter of law. FED. R. CIV. P. 56(c); *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). A genuine issue of material fact is present when there are "disputes over facts that might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). When evaluating the evidence presented on a motion for summary judgment, "the judge's function is not [herself] to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Id*. at 249. A mere existence of a scintilla of evidence favoring the non-movant cannot defeat a properly-supported motion for summary judgment, but a court will deny a motion if evidence is presented from which a fact-finder reasonably could return a verdict for the non-movant. *Id*. at 252. The movant has the initial burden to establish an absence of evidence to support the claimant's case. *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986). If the movant satisfies its burden, the non-movant "may not rest upon its mere allegations or denials of the adverse party's pleadings, but rather must set forth specific facts showing that there is a genuine issue for trial." *Ellington v. City of E. Cleveland*, 689 F.3d 549, 552 (6th Cir. 2012).

Here, the parties have presented cross-motions for summary judgment as to certain conduct and transactions cited to support Trustee's claim for breach of fiduciary duty against Defendants. The standard does not differ when each side seeks to resolve a claim on its own motion for summary judgment. *Taft Broadcasting Co. v. U.S.*, 929 F.2d 240, 248 (6th Cir. 1991). "The court must evaluate each party's motion on its own merits, taking care in each

instance to draw all reasonable inferences against the party whose motion is under

consideration." *Id*. at 248.

**ANALYSIS**

**I.      The elements of a claim for breach of fiduciary duties under Delaware law.**

Because U.S. Coal is a Delaware corporation, the internal affairs doctrine requires that

this Court apply Delaware law to Trustee's breach of fiduciary duty claim against Defendants.

*See*, *e.g.*, *In re Fedders N. Am., Inc.*, 405 B.R. 527, 539 (Bankr. D. Del. 2009).  A board of

directors oversees or manages the business and affairs of a Delaware corporation.  8 Del. C.

§ 141(a).  "In exercising these powers, directors are charged with an unyielding fiduciary duty to

protect the interests of the corporation and to act in the best interests of its shareholders."  *Cede*

*& Co. v. Technicolor*, 634 A.2d 345, 360 (Del. 1993).  "In performing their duties the directors

owe fundamental fiduciary duties of loyalty and care to the corporation and its shareholders."

*Polk v. Good*, 507 A.2d 531, 536 (Del. 1986).  "[T]he standard of conduct for directors requires

that they strive in good faith and on an informed basis to maximize the value of the corporation

for the benefit of its residual claimants, the ultimate beneficiaries of the firm's value…."  *In re*

*Trados Inc. S'holder Litig.*, 73 A.3d 17, 40-41 (Del. Ch. 2013).

At varying times, Defendants served on the Board and owed fiduciary duties to U.S. Coal

while serving on the Board.  Trustee contends that Defendants breached their fiduciary duties to

U.S. Coal through several specific actions.  To succeed on her claim, as to each Defendant,

Trustee must prove: (1) he owed a fiduciary duty to U.S. Coal; (2) he breached that duty; and

(3) U.S. Coal suffered damages owing to the breach.  *In re Broadstripe, LLC*, 444 B.R. 51, 104

(Bankr. D. Del. 2010).

## II. The standard of review differs for breach of fiduciary duty claims based on the factual underpinnings of the alleged misconduct.

To determine whether a plaintiff can satisfy the elements of a breach of fiduciary duty claim, courts will apply different standards of review depending on the circumstances.

> When determining whether directors have breached their fiduciary duties, Delaware corporate law distinguishes between the standard of conduct and the standard of review. The standard of conduct describes what directors are expected to do and is defined by the content of the duties of loyalty and care. The standard of review is the test that a court applies when evaluating whether directors have met the standard of conduct. It describes what a plaintiff must first plead and later prove to prevail.

*Trados*, 73 A.3d at 35-36 (citations omitted). There are three standards of review used to evaluate director conduct under Delaware law and two are at issue here: the business judgment rule and the entire fairness test.

The business judgment rule is a "presumption that in making a business decision the directors of a corporation acted on an informed basis, in good faith and in the honest belief that the action taken was in the best interests of the company." *Aronson v. Lewis*, 473 A.2d 805, 812 (Del. 1984) (citations omitted). "In general, the business judgment rule applies when a board was independent and disinterested in making a business decision." *In re Novell, Inc. S'holder Litig.*, C.A. No. 6032-VCN, 2014 Del. Ch. LEXIS 249, at *19-20 (Del. Ch. Nov. 25, 2014). To that end, the protection afforded by the business judgment rule

> can only be claimed by disinterested directors whose conduct otherwise meets the tests of business judgment. From the standpoint of interest, this means that directors can neither appear on both sides of a transaction nor expect to derive any personal financial benefit from it in the sense of self-dealing, as opposed to a benefit which devolves upon the corporation or all stockholders generally.

*Aronson* at 812. In addition, "the business judgment rule operates only in the context of director action. Technically speaking, it has no role where directors have either abdicated their functions,

or absent a conscious decision, failed to act." *Id.* at 813. The party challenging the application of this presumption carries the burden to establish facts rebutting the presumption. *Id.* at 812.

Conversely, the entire fairness test applies when a board majority is not independent and disinterested. *See*, *e.g.*, *Paramount Commc'ns, Inc. v. QVC Network, Inc.*, 637 A.2d 34, 42 n.9 (Del. 1994) ("where actual self-interest is present and affects a majority of the directors approving a transaction, a court will apply" the entire fairness test); *Heineman v. Datapoint Corp.*, 611 A.2d 950, 953 (Del. 1992) (directors are not "independent" if they are dominated by an interested director); *Mills Acquisition Co. v. MacMillan, Inc.*, 559 A.2d 1261, 1279 (Del. 1989) (the "judicial reluctance to assess the merits of a business decision ends in the face of illicit manipulation of a board's deliberative processes by self-interested corporate fiduciaries."); *Aronson*, 473 A.2d at 812 ("if such director interest is present, and the transaction is not approved by a majority consisting of the disinterested directors, then the business judgment rule has no application whatever…."). As a result, when a claimant "rebuts the business judgment standard—for example, by establishing that at least half of the directors who approved a business decision are not independent or disinterested—the Court reviews the directors' decision under the entire fairness standard, in which case the directors must establish 'to the court's satisfaction that the transaction was the product of both fair dealing and fair price.'" *Calma v. Templeton*, 114 A.3d 563, 577 (Del. Ch. 2015) (quoting *Cede & Co. v. Technicolor, Inc.*, 634 A.2d 345, 361 (Del. 1993)).

The parties disagree as to the standard of review applicable to Trustee's breach of fiduciary duty claim against Goggin and Goodwin. That Trustee's claim derives from multiple discrete transactions complicates the analysis. As appropriate, the applicable standards of review are discussed below for each transaction that Trustee challenges relating to this claim. Certain of

the challenged transactions do not require discussion of the standard of review, however, because

Trustee may not pursue conduct that occurred outside the applicable statute of limitations.

"Where a plaintiff brings a claim based upon multiple allegedly wrongful acts, a court considers

each act in turn in applying the statute of limitations." *Bridgeport Holdings Inc. Liquidating*

*Trust v. Boyer (In re Bridgeport Holdings, Inc.)*, 388 B.R. 548, 562 (Bankr. D. Del. 2008)

(citation omitted).

### III. Challenged transactions: the bases for Trustee's breach of fiduciary duty claim.

Trustee asserts that there are eight transactional bases for which Defendants should be

found liable for breach of the fiduciary duties they owed to U.S. Coal. Each is analyzed below.

#### A. The statute of limitations bars Trustee from pursuing Defendants to recover the alleged damages U.S. Coal suffered based on its $800,000 transfer to USC Management, LLC.

Trustee contends that Defendants violated their fiduciary duties to U.S. Coal with respect

to the $800,000 transfer that U.S. Coal made to USCM. Defendants contend that they are

entitled to a summary judgment that they are not liable for this challenged transaction because

the transfer to USCM occurred before they joined the Board and, therefore, they did not owe

fiduciary duties to U.S. Coal at that time. Defendants also contend that the statute of limitations

bars Trustee from pursuing them with respect to this transfer. In response, Trustee argues that

the Board ratified the transfer shortly after Defendants joined the Board, which imposes liability

on Defendants for the transfer, and that applicable tolling doctrines toll the statute of limitations.

The Court turns first to the statute of limitations.

Under Delaware law, a three-year statute of limitations applies to breach of fiduciary duty

claims, which runs from the date the injury occurred. 10 Del. C. § 8106; *see also Eugenia VI*

*Venture Holdings, Ltd. v. Maplewood Holdings LLC (In re AMC Investors, LLC)*, 524 B.R. 62,

80-81 (Bankr. D. Del. 2015) ("Delaware law sets a three-year statute of limitations for breach of

fiduciary duty.  This limitations period runs from the date of the alleged harm.") (citations omitted).  In addition, the Bankruptcy Code extends the time in which a bankruptcy trustee may file an action to the later of "two years after the order for relief" or "the end of such period," if "such period has not expired before the date of the filing of the petition."  11 U.S.C. § 108(a).

An involuntary petition was filed against U.S. Coal on June 10, 2014.[5]  U.S. Coal transferred $800,000 to USCM on September 30, 2009.  The Board (including Defendants) voted to ratify that transfer on October 13, 2009.  Both 2009 dates precede the petition date by more than three years.  Defendants therefore have carried their burden to show that the statute of limitations expired, which shifts the burden to Trustee to prove that a basis exists to toll the running of the statute.  *In re Tyson Foods, Inc. Consol. S'holder. Litig.*, 919 A.2d 563, 585 (Del. Ch. 2007); *see also Campbell v. Grand Trunk W. R.R. Co.*, 238 F.3d 772, 775 (6th Cir. 2001).

1.      **Delaware law provides that the discovery rule and the doctrine of equitable tolling can apply to toll the statute of limitations, but both tolling doctrines are subject to inquiry notice.**

Trustee argues that the Court should toll the statute of limitations on two bases recognized by Delaware law: the discovery rule and equitable tolling.  The discovery rule tolls the statute of limitations "where the injury is inherently unknowable and the claimant is blamelessly ignorant of the wrongful act and the injury complained of."  *Bridgeport Holdings,* 388 B.R. at 561.  To determine whether the discovery rule applies, a court must assess whether a "reasonably diligent and attentive stockholder knew or had reason to know the facts alleged to constitute the breach of fiduciary duty."  *Cantor v. Perelman*, 414 F.3d 430, 440 (3d Cir. 2005).  "The statute is tolled under the discovery rule if 'the discovery of the existence of [the] cause of

---

[5] The parties have built their statute of limitations arguments around the date the first involuntary petition was filed against one of the affiliated Debtors (LR Mining), which was May 22, 2011.  But the pertinent date for purposes of analyzing whether § 108(a) applies is the date that an involuntary petition was filed against U.S. Coal.

action is a practical impossibility.' . . . '[T]here must have been no observable or objective factors to put a party on notice of an injury.'" *Bridgeport Holdings*, 388 B.R. at 563 (quoting *In re Dean Witter P'ship Litig.*, No. 14816, 1998 Del. Ch. LEXIS 133, at *22-23 (Del. Ch. July 17, 1998), *aff'd*, 725 A.2d 441, 1999 Del. LEXIS 471 (Del. Jan. 6, 1999)).

> The doctrine of equitable tolling also may prevent the statute of limitations from running:
>
> > Under the theory of equitable tolling, the statute of limitations is tolled for claims of wrongful self-dealing, even in the absence of actual fraudulent concealment, where a plaintiff reasonably relies on the competence and good faith of a fiduciary. Underlying this doctrine is the idea that "even an attentive and diligent [investor] relying, in complete propriety, upon the good faith of [fiduciaries] may be completely ignorant of transactions that . . . constitute self-interested acts injurious to the [Partnership]." This doctrine tolls the limitations period until an investor knew or had reason to know of the facts constituting the wrong.
> >
> > …
> >
> > But, the trusting plaintiff still must be reasonably attentive to his interests. "Beneficiaries should not put on blinders to such obvious signals as publicly filed documents, annual and quarterly reports, proxy statements, and SEC filings." Thus, even where defendant is a fiduciary, a plaintiff is on inquiry notice when the information underlying plaintiff's claim is readily available.

*Dean Witter*, 1998 Del. Ch. LEXIS 133, at *21, *36 (citations omitted).

> Accordingly, under Delaware law, neither equitable tolling nor the discovery rule tolls a statute of limitations if the claimant is on "inquiry notice" of the challenged activity; actual notice is not required. *EBS Litig. LLC v. Barclays Global Invs., N.A.*, 304 F.3d 302, 305 (3d Cir. 2002) ("Under Delaware law, however, 'if the limitations period is tolled under any of these theories, it is tolled *only until* the plaintiff discovers (or exercising reasonable diligence should have discovered) his injury. Thus, the limitations period begins to run when the plaintiff is *objectively* aware of the facts giving rise to the wrong, *i.e.*, on inquiry notice.'") (quoting *Dean Witter*, 1998 Del. Ch. LEXIS 133, at *23-24 (emphasis in original)).

2.  **Because U.S. Coal shareholders were on inquiry notice of the $800,000 transfer to USCM, neither the discovery rule nor the doctrine of equitable tolling applies to toll the statute of limitations.**

To support her argument that the discovery rule and the doctrine of equitable tolling apply here, Trustee contends that U.S. Coal was a private company dominated by insiders such that the non-insider shareholders did not know the pertinent facts regarding the $800,000 transfer. With her opposition to Defendants' Motions, Trustee provides affidavits from two non-insider shareholders stating that they "did not have access to U.S. Coal's financial statements, balance sheets, corporate minutes or other internal documents, nor [were they] offered a chance to review such records," and that they had no knowledge that U.S. Coal "transferred $800,000 to allow its management to invest in ECM through" USCM. [ECF Nos. 234-13, 234-14.] Trustee argues that the record establishes that Defendants were fiduciaries who engaged in self-interested acts which injured U.S. Coal, and that the shareholder affidavits confirm that these two tolling doctrines should apply.

The Court disagrees. Delaware law grants a shareholder the right, "for any proper purpose," to "make copies and extracts from … [the entity's] books and records." Del. Code Ann. tit. 8, § 220(b)(1). Through evidence in the record, Defendants proved that the USCM payment was reflected in U.S. Coal's books and records, putting shareholders on inquiry notice of that transaction based on observable corporate information. First, the Minutes of the October 13, 2009 U.S. Coal Board Meeting discuss U.S. Coal's $800,000 transfer to USCM and the subsequent USCM transfer to ECM. "It is well settled that board meeting minutes fall within the ambit of available books and records of a company." *Chammas v. NavLink, Inc.*, C.A. No. 11265-VCN, 2016 Del. Ch. LEXIS 22, at *32 (Del. Ch. Feb. 1, 2016) (citation omitted). Second, the U.S. Coal 2009 and 2010 Audited Financials, which were sent to shareholders in

February 2010 and 2011, respectively, state that U.S. Coal transferred $800,000 in connection with the ECM transaction on behalf of certain U.S. Coal executives.

The $800,000 payment to USCM was not hidden "off-the-books" such that a non-insider shareholder could not have known of the payment and its purpose. Under Delaware law, these documents were readily available. Therefore, it was not a practical impossibility for a reasonably-attentive shareholder to learn of the payment. Shareholders were on inquiry notice of this transfer more than three years before the petition date. The statute of limitations bars Trustee from pursuing her claim based on this transaction.

<h3>3. Trustee's argument that inquiry notice should be considered from the perspective of U.S. Coal's creditors lacks merit.</h3>

Trustee also argues that U.S. Coal's creditors did not receive notice of the USCM transfer and, because U.S. Coal allegedly was insolvent when it occurred, "the weight of authority applying Delaware law – including the most recent cases of the Bankruptcy Court for the District of Delaware – holds that once the corporation is insolvent as U.S. Coal was at all relevant times here, [inquiry notice] may also be considered from the creditors' perspective." [ECF No. 231 at 104 n. 64.] To support this position, Trustee cites two cases: *Vieira v. Hill (In re KNH Aviation Servcs., Inc.)*, 549 B.R. 356 (D.S.C. 2016), and *Forman v. Kelly Capital, LLC (In re Nat'l Serv. Indus.)*, Ch. 7, Case No. 12-12057 (MFW), Adv. No. 14-50377 (MFW), 2015 Bankr. LEXIS 2029 (Bankr. D. Del. June 19, 2015). Neither case validates Trustee's argument.

In *KNH Aviation*, the chapter 7 trustee of a Delaware corporate debtor asserted breach of fiduciary duty claims against its officers and directors, who also were its only shareholders. The defendants, citing *Bridgeport Holdings*, moved to dismiss the claims as time-barred and contended that no tolling exception applied. The U.S. District Court for the District of South Carolina disagreed, finding that the trustee asserted derivative claims on behalf of the debtor's

creditors.  On this basis, the court distinguished *Bridgeport Holdings* and considered the asserted

tolling exceptions from the creditors' perspective.  *KNH Aviation*, 549 B.R. at 364 ("*Bridgeport*

*Holdings* was an adversary proceeding brought by the successor to the debtor companies' causes

of action and therefore dealt with direct claims, not derivative claims on behalf of creditors, as

are involved here.").  As a result, the district court denied the motion to dismiss.

In this case, Trustee stepped into the shoes of U.S. Coal to assert her breach of fiduciary

duty claim.  Trustee is not pursuing this claim in the shoes of U.S. Coal's creditors under

§ 544(b);[6] rather, this claim is property of U.S. Coal's estate under § 541(a).[7]  Because Trustee is

pursuing U.S. Coal's breach of fiduciary duty claim against Defendants, no other party

(including U.S. Coal's creditors) could do so derivatively.  Thus, *KNH Aviation* is off-point.

In *National Service Industries*, the debtor's only two stockholders comprised its board of

directors.  Its chapter 7 trustee asserted claims for fraudulent transfers and breaches of fiduciary

duties against the directors and other entities they owned.  The defendants moved to dismiss

certain claims on statute of limitations grounds.  The trustee responded that equitable tolling

applied to the claims to recover actually-fraudulent transfers under Delaware law and

§ 544(b)(1)—which permits a trustee to avoid transfers that are avoidable "under applicable law

by a creditor holding an unsecured claim"—and also to the breach of fiduciary duty claims.

The bankruptcy court agreed, and first explained that equitable tolling *might* apply to the

trustee's actually-fraudulent-transfer claims under § 544(b)(1) depending on whether the

creditors were on inquiry notice of the facts related to the fraudulent transfers.  2015 Bankr.

---

[6] Unless otherwise indicated, all chapter and section references are to the United States Bankruptcy Code, 11 U.S.C. §§ 101-1532.

[7] In fact, under Delaware law, "[t]he creditors of a Delaware corporation that is either insolvent or in the zone of insolvency have no right, as a matter of law, to assert direct claims for breach of fiduciary duty against its directors." *N. Am. Catholic Educ. Programming Found., Inc. v. Gheewalla*, 930 A.2d 92, 103 (Del. 2007).

LEXIS 2029, at *22. The court next considered equitable tolling as to the breach of fiduciary duty claim; its full analysis of the issue is as follows:

> Although most of the actions that are the basis of the Trustee's claims for breach of fiduciary duty occurred before July 12, 2009, the Court finds that the Trustee has pled sufficient facts that if established meet the doctrine of equitable tolling. The Trustee asserts that the Debtor's directors engaged in self-dealing in violation of their fiduciary duties. In addition, because the Debtor was a private company, creditors were not aware of the transactions. Therefore, the Court will deny the Defendants' Motions to Dismiss the breach of fiduciary duty claims.

*Id*. at *24 (record citations omitted).

Because the debtor's two directors in *National Service Industries* also were its only shareholders, and they allegedly looted the entity for their personal gain, no other person could have obtained access to the entity's books and records to investigate the directors' actions. On an early motion to dismiss, and without citing or discussing authority supporting its decision to consider equitable tolling from a creditor's perspective for this breach of fiduciary duty claim, the court found that equitable tolling might apply. This unpublished, non-binding decision is not factually on point. Because it is unclear whether the court heard conflicting arguments and the opinion omits supporting authority, it also is not persuasive on this issue.

Other decisions from courts in Delaware, however, provide greater clarity with respect to whose knowledge is pertinent to a tolling inquiry. In a published decision applying Delaware law, the debtors' sole creditor was granted derivative standing to pursue prepetition breach of fiduciary duty claims on the debtors' behalf. *Eugenia VI Venture Holdings, Ltd. v. Maplewood Holdings, LLC (In re AMC Investors, LLC)*, 551 B.R. 148, 151 (D. Del. 2016). The defendants argued that the statute of limitations barred the claims, and the bankruptcy court agreed, concluding that the *creditor* had knowledge of the defendants' alleged misconduct. On appeal, the district court reversed and remanded.

> The inquiry should not have turned on [the creditor's] knowledge; the relevant inquiry turns on a plaintiff's ability to discover the claim, and here, Debtors are the only plaintiffs with a breach of fiduciary duty claim against Defendants. Delaware law required the Bankruptcy Court to evaluate when Debtors discovered facts constituting the basis for the breach of fiduciary duty claims, or the existence of facts sufficient to put Debtors on inquiry notice.

*Id*. at 155 (citations omitted).  Although the opinion does not disclose whether the debtors in *AMC Investors* were insolvent when the alleged bad acts occurred, the court tellingly concluded that the tolling inquiry must be analyzed from the debtors' perspective—as the claims were property of the debtors' estates—and not from the perspective of the sole creditor.

Similarly, another decision on tolling and inquiry notice hinged on the distinction between a fiduciary duty claim that is estate property under § 541(a) and one that a trustee may pursue on behalf of creditors under § 544.  *Miller v. Kirkland & Ellis LLP (In re IH 1, Inc.)*, Ch. 7 No. 09-10982 (LSS), Adv. Pro. No. 12-50713 (LSS), 2016 Bankr. LEXIS 4604 (Bankr. D. Del. Sept. 28, 2016) (hereafter *"Indalex"*).  In *Indalex*, a chapter 7 trustee for several debtors (referred to jointly as "Indalex") sued a law firm, alleging that it aided and abetted breaches of fiduciary duty.  In its motion for summary judgment, the firm raised the statute of limitations.  The bankruptcy court, after considering tolling doctrines, agreed with the firm.

The court first assumed that the firm hid a conflict of interest from Indalex, making tolling doctrines potentially applicable.  The court then explained: "Actions that may be pursued by bankruptcy trustees generally fall into two categories: "(1) those brought by the trustee as successor to the debtor's interest included in the estate under Section 541, and (2) those brought under one or more of the trustee's avoiding powers."  *Id*. at *30 (citation omitted).  The court next found that whether Indalex was on inquiry notice, not the trustee, was the issue presented: "if the debtor is barred from bringing the section 541 claims by the relevant statute of limitations, so too is the chapter 7 trustee."  *Id*. at *31.  And, the court concluded that, because the claims at

issue were prepetition claims against the debtor's attorneys, "the Court must look to *Indalex's* knowledge, or what it should have known, in connection with the claims the Trustee is asserting." *Id*. at *32 (emphasis in original).

The court proceeded to consider the nature of the alleged bad acts and noted that a problematic dividend "was made while Indalex was insolvent and/or made Indalex insolvent." *Id*. at *35. The court then analyzed whether the *debtors* could be deemed to have been on inquiry notice about the alleged wrongdoing and concluded:

> [b]ecause the undisputed facts demonstrate that Indalex possessed sufficient information shortly after the time of the Dividend, which, if pursued, would have led it to discover the alleged injury—that the Dividend was made while Indalex was insolvent, or rendered it insolvent—the Trustee cannot seek refuge under his tolling theories."

*Id*. at *36. It stated that, based on the available information, "the company at a minimum should have recognized the need to investigate the Dividend given the close temporal proximity between the distribution and the company's own declaration that Indalex Inc. was balance sheet insolvent." *Id*. at *38. The court concluded that the Indalex's knowledge was pertinent because it was the party who asserted the claim (through its bankruptcy trustee). *Id*. at *39 n.136.

Finally, the bankruptcy court also discussed the tolling issue from the perspective of the debtor's creditors and non-insider stockholders. It noted that such parties had inquiry notice based on SEC filings. But the court also clarified *when* it would be appropriate to view tolling from a creditor's perspective: "even if this was a derivative action brought by stockholders or creditors of an allegedly insolvent Indalex, the Complaint would similarly be barred by the statute of limitations." *Id*. at *39-40.

Here, Trustee pursues a breach of fiduciary duty claim that is estate property under § 541(a). Thus, creditor knowledge of U.S. Coal's $800,000 transfer to USCM is immaterial, and a lack of creditor knowledge does not constitute a basis to toll the statute of limitations under

Delaware law and the circumstances presented.  The statute of limitations bars Trustee's claim

against Defendants with respect to this challenged transaction, no tolling doctrine applies, and

Defendants are entitled to a summary judgment on this transaction.

### B. The statute of limitations bars Trustee from pursuing Defendants concerning the Severance Agreement between U.S. Coal and Robert Gabbard.

Trustee next contends that Defendants violated their fiduciary duties to U.S. Coal by

causing U.S. Coal to enter into the Severance Agreement with Gabbard.  The Board, on which

Defendants served at the time, unanimously approved the Severance Agreement at its May 12,

2011 meeting.  Trustee contends that U.S. Coal should not have paid Gabbard severance benefits

given the circumstances of his departure and that Defendants breached their fiduciary duties by

voting to approve the Severance Agreement.  Defendants again raise the statute of limitations as

this transaction occurred more than three years prior to the June 10, 2014 petition date.[8] *See* 10

Del. C. § 8106.

Trustee again raises the equitable tolling and discovery rule as bases to toll the statute of

limitations with respect to this transaction.  Trustee's argument about the application of these

doctrines to the Severance Agreement is no different than her position on the USCM transfer.

Again, Trustee cannot establish that it was practically impossible for a U.S. Coal shareholder to

know that U.S. Coal entered into the Severance Agreement.  The May 12, 2011 U.S. Coal Board

Meeting minutes attached the Severance Agreement and confirm that the Board unanimously

approved its terms.  As stated previously, Delaware law grants shareholders the right to review

corporate minutes upon demand.  As inquiry notice defeats both of Trustee's asserted tolling

exceptions, the statute of limitations applies and bars Trustee from further pursuit of her claim

---

[8] Trustee does not argue that Defendants are liable for breaching their fiduciary duties based on U.S. Coal's transfers of funds to Gabbard over time under the Severance Agreement.

against Defendants regarding the Severance Agreement. The Court also again rejects Trustee's argument that whether U.S. Coal's creditors knew of the Severance Agreement is pertinent to the tolling issue. Defendants are entitled to a summary judgment with respect to this alleged breach.

> **C.** **Trustee may continue to pursue Goggin, but not Goodwin, for certain transfers from U.S. Coal to ECM within the three-year statute of limitations.**

Trustee next contends that Defendants violated their fiduciary duties to U.S. Coal by causing U.S. Coal to pay on debt owed to ECM when it did not pay other Senior Lenders.[9] Trustee contends that, between November 30, 2009, and December 31, 2012, U.S. Coal paid ECM 31 times when at least one other Senior Lender was not paid on its debt as required under the ECM Credit Agreement. She seeks a summary judgment in her favor on this issue, and Defendants also moved for a summary judgment regarding these payments.

U.S. Coal had two chief financial officers in the relevant time period, Wolff and Windisch. These officers' responsibilities included financial oversight and paying U.S. Coal's debts and obligations. To carry out their responsibilities, in connection with regular Board meetings and calls, the CFOs would give the Board written information regarding the debts owed and would offer recommendations about which payments to make. Wolff testified that "Keith [Goggin] and the Board" gave instructions to him about paying "certain creditors in the allocation process." [ECF No. 212-1 at 178-79.] Windisch testified that, in his role, he had discussions with the Board about "who got paid." [ECF No. 194-10 at 10.]

"While a corporate entity is overseen by a board of directors, in larger organizations the day to day management typically is undertaken by others. A board of directors provides guidance and oversight; others operate the business." *In re British Am. Ins. Co.*, 425 B.R. 884,

---

[9] Based on testimony from Michael Windisch, formerly U.S. Coal's CFO, Trustee defined the term Senior Lenders to include ECM, ECM II, the LR Sellers, the JAD Sellers, Dean-McAfee Holdings, and the CAM Entities.

912 (Bankr. S.D. Fla. 2010). Trustee's arguments about payments made to ECM implicate the relationship between the directors and the officers operating U.S. Coal's business.

      1.      **The statute of limitations bars Trustee from pursuing liability against Defendants for payments made to ECM prior to May 22, 2011.**

Trustee seeks to impose liability on Defendants for U.S. Coal transfers to ECM prior to June 10, 2011, the cut-off date for the three-year statute of limitations. Trustee again argues that equitable tolling and the discovery rule should apply to toll her breach of fiduciary duty claim with respect to these payments, citing the same evidence as discussed above.

Section 6 of both the U.S. Coal 2009 and 2010 Audited Financials includes detailed information about the debts owed by U.S. Coal and its subsidiaries. This section of each financial report ("Notes Payable and Interest Expense") provides historic balances for the debts owed and narrative information regarding each debt. The historic balances indicate that certain debts increased in size, and certain other debts remained entirely or nearly unchanged in these two years—yet in both reports the notes payable balances to ECM decreased. In fact, the ECM loan balance shrunk by more than seven million dollars in 2010. These documents, sent to shareholders in February 2010 and February 2011, contained ample information to put shareholders on notice of the existence of corporate debts, the aggregate payments on those debts, and the seemingly disproportionate payments to ECM when compared with debts owed to other lenders. Both reports not only state that ECM received significant repayment of principal and interest in 2009 and 2010, but they affirmatively disclose that "ECM was formed by a subset of existing shareholders, additional investors and certain executives of the Company…." [ECF Nos. 240-2 at 30, 240-4 at 28.]

In addition, as discussed above, shareholders had the statutory right to inspect U.S. Coal's books and records. Del. Code Ann. tit. 8, § 220(b)(1). To the extent that shareholders

had questions about U.S. Coal's payments on its debts, they could have requested access to U.S. Coal's accounting records detailing said payments. *Saito v. McKesson HBOC, Inc.*, 806 A.2d 113, 115 (Del. 2002) ("A stockholder who demands inspection for a proper purpose should be given access to all of the documents in the corporation's possession, custody or control, that are necessary to satisfy that proper purpose.").

Because the 2009 and 2010 Audited Financials were sent directly to shareholders, and because shareholders had statutory inspection rights under Delaware law, shareholders had inquiry notice of both the debt payments to ECM and the fact that ECM was owned by U.S. Coal insiders. Thus, Trustee is not entitled to the benefit of tolling exceptions for debt payments made to ECM prior to June 10, 2011. The statute of limitations bars Trustee from pursuing her claim with respect to such transfers, and Defendants are entitled to a summary judgment in this regard.

> **2.      Trustee failed to submit evidence to show that a material dispute of fact exists as to why Goodwin should be liable for debt payments U.S. Coal made to ECM after June 10, 2011.**

Goodwin served on the U.S. Coal Board from October 1, 2009, to October 23, 2012. Most of the payments at issue respecting this allegation of wrongdoing occurred while Goodwin was a member of the Board; thus, as a director, Goodwin owed fiduciary duties to U.S. Coal in this time frame. Trustee contends that Goodwin breached his duty of loyalty to U.S. Coal by causing U.S. Coal to make debt payments to ECM when other Senior Lenders were not paid on their debts. Trustee has not shown, however, that the scope of Goodwin's duties as a director included telling the CFOs which creditor's debts U.S. Coal would pay. Trustee also has not shown that Goodwin himself ever gave any direction to the CFOs about even one payment U.S. Coal made to ECM between June 10, 2011 and October 23, 2012.

"Directors of a Delaware corporation owe two fiduciary duties—care and loyalty. The duty of loyalty includes a requirement to act in good faith, which is 'a subsidiary element, *i.e.*, a

27

condition, of the fundamental duty of loyalty.'" *In re Orchard Enters., Inc.*, 88 A.3d 1, 32-33

(Del. Ch. 2014) (citation omitted). To the extent a director takes an action (or engages in

pertinent omissions) in their role as a director, these duties apply.

> The duty of loyalty … "mandates that the best interest of the corporation and its
> shareholders take [] precedence over any interest possessed by a director, officer
> or controlling shareholder and not shared by the stockholders generally." *In re
> Walt Disney Co. Derivative Litig.*, 907 A.2d 693, 751 (Del. Ch. 2005), *aff'd*, 906
> A.2d 27 (Del. 2006) (citing *Cede*, 634 A.2d at 360). "A breach of loyalty claim
> requires some form of self-dealing or misuse of corporate office for personal
> gain." *Official Comm. of Unsecured Creditors v. Bay Harbour Master Ltd. (In re
> BH S & B Holdings LLC)*, 420 B.R. 112, 150 (Bankr. S.D.N.Y. 2009) (citing
> *Joseph v. Frank (In re Troll Commc'ns)*, 385 B.R. 110, 118 (Bankr. D. Del.
> 2008)). Further, "the duty of good faith is a 'subsidiary element' of the
> 'fundamental duty of loyalty.'" *Burtch v. Huston (In re USDigital)*, 443 B.R. 22,
> 41 (Bankr. D. Del. 2011) (quoting *Guttman v. Huang*, 823 A.2d 492, 506 n. 34
> (Del. Ch. 2003)). A breach of the duty of good faith may be demonstrated by
> showing the defendant (i) "intentionally [acting] with a purpose other than that of
> advancing the best interest of the corporation," (ii) "acting with the intent to
> violate applicable positive law," or (iii) "intentionally failing to act in the face of a
> known duty to act, demonstrating a conscious disregard for his duties." *Disney*,
> 906 A.2d at 67.

*Guiliano v. Ferdinand (In re Liquid Holdings Grp., Inc.)*, 2018 Bankr. LEXIS 1665, at *31

(Bankr. D. Del. June 6, 2018); *see also Autobacs Strauss, Inc. v. Autobacs Seven Co. (In re

Autobacs Strauss, Inc.)*, 473 B.R. 525, 562 (Bankr. D. Del. 2012) ("the duty of loyalty is 'an

affirmative obligation to protect and advance the interests of the corporation and mandates that

[the director] absolutely refrain from any conduct that would harm the corporation.'") (citation

omitted). Thus, for liability to attach to Goodwin for the payments U.S. Coal made to ECM

rather than other parties, Trustee must produce evidence to establish that Goodwin either took an

action as a director or intentionally failed to act in the face of a known duty to act.

The Court reviewed the evidence Trustee submitted on this issue. It establishes that U.S.

Coal's CFOs, whose responsibilities included managing the Debtors' finances, provided a

schedule of U.S. Coal's debt and vendor obligations to "the Board" to be discussed during the

Board's regular calls and meetings. Wolff testified that Goggin "and the Board" directed which creditors would and would not be paid upon review of the schedule. There is, however, no evidence of votes taken by the Board with respect to payments to be made (or not made) in the pertinent time frame.[10] Additionally, at this advanced stage of the litigation, Trustee has not presented even a scintilla of evidence that Goodwin provided any such direction to the CFOs, or that Goodwin (who was not ECM's manager) insisted that ECM receive its debt payments when other creditors were not being paid or ECM would take action. Instead, Trustee lumps Goodwin together with "the Board" and makes a conclusory assertion that, because "the Board" advised the CFOs on payments, Goodwin must have done so.

Goodwin seeks a summary judgment here. On a motion for summary judgment, a court must view the evidence and draw all reasonable inferences therefrom in the non-movant's favor. *Matsushita*, 475 U.S. at 587. But it is equally true that, to survive a properly-supported motion for summary judgment, the non-movant must show that a genuine issue of material fact exists. *Emmons v. McLaughlin*, 874 F.2d 351, 353 (6th Cir. 1989). And, as Trustee also moved for a summary judgment against Goodwin related to these transfers, Trustee had an obligation to provide evidence to support all elements of her claim against him. To oppose Goodwin's Motion and to support Trustee's Motion against Goodwin on this issue, Trustee had to put forward evidence of what Goodwin did or, in the face of a known duty to act, failed to do concerning the debt payments to ECM for which he should be held liable. The Court may not accept conclusory assertions as true, and Trustee provides nothing with respect to Goodwin's conduct or omissions related to the purportedly inappropriate debt payments to ECM beyond mere conclusory

---

[10] Trustee provided evidence regarding a July 2010 Board meeting and a related vote by the Board on the allocation of funds for U.S. Coal debt payments. Goodwin did not participate in the vote as he was not present. And, as discussed above, the statute of limitations bars Trustee from pursuing Goodwin for payments predating June 10, 2011.

assertions. *Alexander v. CareSource*, 576 F.3d 551, 560 (6th Cir. 2009) ("Conclusory statements unadorned with supporting facts are insufficient to establish a factual dispute that will defeat summary judgment."). Goodwin is entitled to a summary judgment in his favor with respect to this component of Count 7, and Trustee's motion for summary judgment is denied.

### 3. Trustee's claim against Goggin related to payments made to ECM must proceed to trial.

In contrast, Trustee tendered evidence that Goggin gave direction to, at least, Wolff about which debts U.S. Coal should pay and when. The question is whether, based on the evidence presented, a genuine issue of material fact exists that would require a trial with respect to this aspect of Trustee's claim against Goggin.

The parties dispute the standard of review applicable to Trustee's claim against Goggin concerning the payments to ECM. Trustee contends that the entire fairness test applies, while Goggin claims that the business judgment rule applies. Typically, when a court evaluates which standard of review to apply—particularly with respect to the business judgment rule—the challenged activity at issue is an action by an entity's board, not the conduct of a single director. *See*, *e.g.*, *Orman v. Cullman*, 794 A.2d 5, 19-20 (Del. Ch. 2002) (citations omitted). In this instance, however, "board action" is not at issue.

The record does not contain evidence that the entire Board, by formal majority vote, decided which entities should be paid and which should not in the relevant time frame. Rather, the Board routinely received briefings from U.S. Coal's CFOs, and "Keith [Goggin] and the Board" would provide informal instructions to the CFOs on how to allocate funds amongst the creditors to be paid. At the very least, Trustee proved the existence of a dispute of material fact that when Goggin told the CFOs what to do, the officers listened to his instructions because he was a director and they reported to the Board.

To the extent that Goggin took it upon himself to direct U.S. Coal's officers about the payment of the entity's debts, any actions he took were subject to his fiduciary obligations to U.S. Coal. Goggin cannot avoid potential liability for providing inappropriate instructions to corporate officers because the Board (of which he was a member) did not hold a formal vote on who should receive debt payments; liability can be imposed even where a director fails to act in the face of a known duty to act. *Brehm v. Eisner (In re Walt Disney Co. Derivative Litig.)*, 906 A.2d 27, 67 (Del. 2006). Further, at the time Goggin provided direction to U.S. Coal's CFOs regarding debt payments, he was the sole manager of ECM, U.S. Coal's largest creditor and the primary recipient of U.S. Coal debt repayments.

The Court finds that neither Goggin nor Trustee is entitled to a summary judgment on this aspect of Trustee's breach of fiduciary duty claim against Goggin. At trial, Trustee must prove by a preponderance of the evidence that the presumption of the business judgment rule should not apply to shield Goggin from liability. More specifically, Trustee "must present evidence that creates 'a reasonable doubt. . . whether [Goggin] honestly and in good faith believed that the action was in the best interest of the corporation.'" *Gavin v. Tousignant (In re Ultimate Escapes Holdings, LLC),* 551 B.R. 749, 762 (D. Del. 2016). Should Trustee establish that Goggin is not entitled to the presumption afforded by the business judgment rule, owing to a conflict of interest based on his dual fiduciary status or otherwise, the burden will shift to Goggin to prove the entire fairness of his instructions to the CFOs.[11] In sum, Trustee's claim against Goggin grounded in U.S. Coal's post-June 10, 2011 payments to ECM shall proceed to trial.

---

[11] Ordinarily, when considering whether to apply the business judgment rule, the court would consider whether "there were not enough independent and disinterested individuals among the directors making the challenged decision to comprise a board majority." *Trados,* 73 A.3d at 44-45 (citation omitted). Here, there was no "board majority" that made a "decision" by voting on a transaction; in the presence of "the Board," if Wolff's testimony is accurate, Goggin directed the CFOs which creditors to pay. Accordingly, standard application of Delaware law does not fit this scenario—the independence and interestedness of other members of the Board is not pertinent here.

**D.** **Trustee may continue to pursue Goggin and Goodwin for the loss of the Macquarie deal.**

On August 22, 2011, Macquarie sent U.S. Coal a letter of intent setting forth an offer to refinance its debt, proposing to loan U.S. Coal $95 million at an effective interest rate of under 8%. The proposal would have retired ECM's debt and virtually all other debt for U.S. Coal and its subsidiaries. As a condition, Macquarie wanted three independent directors added to the existing four-member Board. By August 25, 2011, however, the deal was "dead."

Trustee contends that Defendants and the other members of the Board wanted to solidify their Board positions and therefore improperly caused U.S. Coal to "reject" the Macquarie proposal because Macquarie insisted upon the addition of three independent directors. She asserts that the Board members were neither independent nor disinterested in connection with this challenged transaction for several reasons and claims that Defendants are liable for damages that U.S. Coal suffered because U.S. Coal rejected Macquarie's proposal. Defendants respond that the Board never voted on a transaction with Macquarie, and thus there is no "board action" to review. Defendants also argue that four Board members (including Defendants) discussed the proposal and consulted with U.S. Coal's outside counsel and, based on those discussions and consultations, had outside counsel send a marked-up counterproposal back to Macquarie. According to Defendants, it was Macquarie that declined to go forward with a deal upon receipt of that counterproposal.

The duty of loyalty "mandates that the best interest of the corporation and its shareholders takes precedence over any interest possessed by a director, officer or controlling shareholder and not shared by the stockholders generally." *Cede & Co. v. Technicolor, Inc.*, 634 A.2d 345, 361 (Del. 1993). Director disloyalty may include "motives of entrenchment." *Id*. at 363; *see also Benihana of Tokyo, Inc. v. Benihana, Inc.*, 891 A.2d. 150, 175 (Del. Ch. 2005)

(describing entrenchment as when directors take action with a motive to ensure their continued service on and/or to prevent their removal from a corporate board), *aff'd*, 906 A.2d 114 (Del. 2006); *Burtch v. Seaport Capital, LLC (In re Direct Response Media, Inc.),* 466 B.R. 626, 652 (Bankr. D. Del. 2012) ("In the case of the duty of loyalty, the plaintiff can prevail by showing that board action was not undertaken in a good faith effort to further the stockholders' best interests, but for some personal reason, such as entrenchment."). However, a claim that directors rejected a transaction based on a desire to maintain board control is insufficient:

> [T]he plaintiffs allege that the Director Defendants had a disqualifying self-interest because they were financially motivated to maintain the status quo. A claim of this kind must be viewed with caution, because to argue that directors have an entrenchment motive solely because they could lose their positions following an acquisition is, to an extent, tautological. By its very nature, a board decision to reject a merger proposal could always enable a plaintiff to assert that a majority of the directors had an entrenchment motive. For that reason, the plaintiffs must plead, in addition to a motive to retain corporate control, other facts sufficient to state a cognizable claim that the Director Defendants acted disloyally.

*Gantler v. Stephens*, 965 A.2d 695, 707 (Del. 2009).

Trustee argues that the Board's decision to reject Macquarie's "offer" amounted to a breach of the fiduciary duty of loyalty by Defendants because the Board deprived U.S. Coal of better financing terms to favor their own interests; to wit, the four directors (Goggin, Goodwin, Koutsodimitropoulos, Whitt), all of whom had ties to ECM, wanted to ensure that U.S. Coal continued to pay ECM principal and a high rate of interest on its existing loan. Trustee also avers that contemporaneous records and admissions show that the Board's refusal to agree to add three independent directors is why the Macquarie deal fell apart. Both U.S. Coal's then-CFO, Wolff, and Macquarie's representative for the potential deal, Carrillo, testified that they believed that the Macquarie deal would have closed and benefitted U.S. Coal but for the Board's rejection of independent directors.

Similar to the circumstances surrounding the challenged debt payments to ECM, there is no specific "board action" to review here; the Board did not take a formal, recorded vote on Macquarie's term sheet. But there is no dispute that U.S. Coal's directors, including Defendants, consulted with each other and with counsel and decided to make a counter-proposal to Macquarie. As discussed earlier, the Board's choice not to hold a formal vote does not immunize its decision from scrutiny. In addition, in this instance (unlike the ECM debt payments), there is essentially one transaction considered within a short window of time to be reviewed, rather than discussions around multiple payments made over a period of about twenty months. Under these circumstances, a traditional analysis applies to determine whether, under Delaware law, Defendants are entitled to the benefit of the business judgment rule presumption.

Defendants argue that, if this conduct is subject to scrutiny notwithstanding the absence of a board vote, the business judgment rule should apply because there is no evidence in the record to dispute that the members of the Board were disinterested and independent. Trustee contends that the business judgment rule should not apply, and that Defendants must satisfy the entire fairness test with respect to the Macquarie rejection.

Having reviewed the parties' arguments and the evidence submitted, the Court concludes that Defendants have not established that the application of the business judgment rule requires this Court to grant a summary judgment in their favor with respect to this aspect of Trustee's claim. Rather, Trustee submitted sufficient evidence to demonstrate that a genuine issue of material fact exists as to whether Goggin dominated the Board, such that the other three members of the Board (Goodwin, Koutsodimitropoulos, Whitt) were not independent with respect to their decision-making on this transaction. However, the Court also finds that the presumption of the business judgment rule cannot be rebutted based on Trustee's arguments that:

(1) the members of the Board were materially interested in the Macquarie deal based upon their investments in and/or ties to ECM because Trustee failed to submit sufficient evidence regarding materiality as to each director, (2) this potential transaction involved self-dealing by any member of the Board, (3) the four members of the Board had an entrenchment motive for rejecting the Macquarie deal, particularly given that the addition of three independent directors would have neither resulted in the ouster of the existing directors nor lessened their collective power on the Board, or (4) any U.S. Coal director had a conflict of interest as a dual fiduciary in connection with the Macquarie transaction.

Given the Court's conclusion, Defendants' Motions are denied as to this alleged breach. At trial, the burden will remain on Trustee to rebut the business judgment rule presumption relating to the Macquarie deal rejection owing to a lack of independence because of Goggin's alleged dominance of the Board.

E.    **Trustee may continue to pursue Goggin, but not Goodwin, for the ECM II transaction.**

After U.S. Coal did not come to terms with Macquarie in August 2011, U.S. Coal entered into a different transaction with ECM II in December 2011. The scope of that deal was much smaller; while Macquarie offered to refinance almost all of U.S. Coal's debt with a $95 million loan facility at an 8% effective rate of interest, the ECM II deal involved loans totaling about $6.7 million at 18% interest with a 5% default rate of interest.

After U.S. Coal did not find other financing, Goggin formed ECM II on October 25, 2011, to loan funds to Debtors to pay off debt maturing at the end of December 2011. Goggin and Goodwin invested in ECM II along with other investors not affiliated with U.S. Coal or ECM. While neither Goodwin nor Goggin held a majority membership interest in ECM II, Goggin served as the LLC's sole manager. There is no dispute that Defendants disclosed that

35

they were investors in ECM II. When the five-member Board voted to approve the ECM II transaction, Goggin and Goodwin abstained from voting while the three other directors (Collins, Whitt, Koutsodimitropoulos), a board majority, voted to approve it.

Trustee contends that U.S. Coal's refusal to agree to Macquarie's terms should be considered as pertinent context for U.S. Coal's later decision to strike a deal with ECM II. Defendants argue that the ECM II transaction is analytically separate from the Macquarie deal.

1. **Goodwin is entitled to a summary judgment with respect to the breach of fiduciary duty claim against him regarding the ECM II transaction.**

In her response to Defendants' Motions, Trustee repeatedly refers to "Goggin and Goodwin" as taking collective action. [*See*, *e.g.*, ECF No. 231 at 98 ("With Macquarie and its under 8% take-out financing removed from the picture, Goggin and Goodwin made sure U.S. Coal stayed in a bind where it had no other alternative other than ECM. Therefore, they were able to impose an effective 23% loan on U.S. Coal – a 15% higher rate.").] But a careful review of Trustee's evidence and arguments reflects that, notwithstanding such conclusory statements, Trustee did not offer evidence of any action that Goodwin took in connection with the ECM II transaction besides investing in ECM II while also serving on the Board.

Trustee does not contend that Goodwin hid his interest in ECM II. Goodwin was not ECM II's manager and Trustee does not argue that Goodwin negotiated with U.S. Coal on its behalf or that he had the authority to bind ECM II on the terms of this transaction. Goodwin also did not vote on the ECM II loan as a U.S. Coal director. In other words, Trustee did not submit even a scintilla of evidence to show that Goodwin took any action, or failed to act in the face of a known duty to act, as a director of U.S. Coal on this transaction such that he could have breached a duty to U.S. Coal. And, Trustee failed to provide legal authority for the proposition that, when a director participates with others in making a loan to the entity on whose board he sits—but

36

discloses his interest, does not negotiate the terms of the loan on behalf of either party, and does not vote to approve it—that director engages in conduct implicating his fiduciary duty of loyalty. Therefore, Goodwin is entitled to a summary judgment in his favor as to the ECM II transaction.

>      **2.      Trustee's claim against Goggin with respect to the ECM II
>               transaction will proceed to a trial on the merits.**

Goggin was ECM II's manager.  As its manager, and on its behalf, Goggin negotiated with U.S. Coal's CEO and CFO on the terms of the ECM II transaction, specifically including the security granted to ECM II and the interest rates ECM II would require on the loans.  While he was negotiating with U.S. Coal's representatives on behalf of ECM II, Goggin also was serving on the U.S. Coal Board.  Accordingly, Goggin had a conflict of interest as a dual fiduciary in connection with this loan transaction.

Three non-interested directors voted to approve the ECM II transaction.  However, a material dispute of fact exists about the independence of those directors because of evidence that Goggin dominated the Board.  Further, given the deposition testimony of Koutsodimitropoulos, a material dispute of fact exists regarding whether voting members of the Board were sufficiently informed of the terms of the deal before voting to approve it.  For these reasons, and in light of his conflict of interest as a dual fiduciary, Goggin's Motion is denied with respect to the ECM II transaction.  At trial, the burden will remain on Trustee to rebut the business judgment rule presumption related to this transaction.

>      **F.      Goggin and Goodwin are entitled to a summary judgment on Trustee's claim
>               about the legal fees U.S. Coal paid to the Nelson Law Firm.**

On September 16, 2010, U.S. Coal noteholder Lawrence Kaplan filed suit against U.S. Coal in state court in New York, contending that U.S. Coal breached a contract in connection with his "put rights."  U.S. Coal retained Pryor Cashman LLP to defend the Kaplan lawsuit.

ECM then retained The Nelson Law Firm ("NLF") to represent its own interests and had NLF try to intervene into that lawsuit on ECM's behalf.

On February 14, 2012, the CAM entities filed a lawsuit against U.S. Coal, ECM, Goggin, and Goodwin, among others, in New York state court. The CAM entities asserted breaches of contract by various defendants and contended that the director and officer defendants named in that lawsuit "engage[d] in a pattern of interested transactions and self-dealing resulting in the unfair dilution of US Coal common stock and misappropriation of corporate resources." [ECF No. 196-4 at ¶ 2.] U.S. Coal engaged Nixon Peabody LLP to act as its counsel in the CAM lawsuit, and that firm also represented Goodwin and other defendants in the suit. However, ECM and Goggin both retained NLF to defend their interests in the CAM lawsuit. U.S. Coal paid bills from NLF associated with the Kaplan and CAM lawsuits through December 2013.

Trustee contends that Defendants breached their fiduciary duties to U.S. Coal by requiring U.S. Coal to engage NLF to defend allegations of wrongdoing based on Defendants' conduct. She also argues that Defendants should be held liable because NLF charged exorbitant fees for its work. Defendants move for a summary judgment.

### 1. Trustee offers no support for her claim that Goodwin engaged in misconduct related to NLF fees.

Goodwin contends that he is not liable with respect to the payment of NLF legal fees because NLF never represented him in connection with either the Kaplan lawsuit or the CAM lawsuit. Trustee responds that Goodwin is liable because "he caused U.S. Coal to pay ECM for conduct that was in breach of its contracts and injurious to U.S. Coal." [ECF No. 231 at 93 n.61.][12] It is unclear exactly what this statement means. More problematic is that Trustee offers

---

[12] Trustee also argues that "[t]he claim against Goodwin for fees paid to the Nelson Firm is limited to amounts accrued before Goodwin resigned from the Board." [ECF No. 231 at 93 n.61.]

no evidence of any specific conduct by Goodwin to support her contention that Goodwin took an action in violation of his fiduciary duties that somehow "caused" U.S. Coal to pay for NLF's fees for its work in either the Kaplan lawsuit or the CAM lawsuit. Based upon Trustee's failure to demonstrate a genuine issue of material fact with respect to any conduct by Goodwin, Goodwin is entitled to a summary judgment on this issue.

        **2.**        **Goggin and ECM had the right to be represented by counsel of their choice, and Trustee offers insufficient evidence to support the contention that NLF fees were "egregious."**

Goggin was a named defendant in the CAM lawsuit. Goggin correctly notes that U.S. Coal's charter and bylaws, in place when Defendants joined the Board, expressly provided for director indemnification and required U.S. Coal to indemnify him for his legal fees. Rather than use U.S. Coal's counsel (Nixon Peabody) in the CAM lawsuit, Goggin retained NLF to represent him.

Trustee does not argue that Goggin's right to indemnification under the charter and bylaws should not be honored, nor does she contend that the charter and bylaws did not require that Goggin be indemnified in relation to the CAM lawsuit. Trustee also does not assert that Goggin breached his fiduciary duty because he did not engage the same counsel as U.S. Coal or its other directors in the CAM litigation. Rather, Trustee contends Goggin's wrongful conduct as a director led Kaplan and CAM to file lawsuits against U.S. Coal and him (among others), and therefore he should be liable for the fees NLF charged in connection with those lawsuits.

To be clear, Trustee's breach of fiduciary duty claim against Goggin regarding his own engagement of the NLF law firm is premised upon the fact that U.S. Coal had to pay his legal fees. But Goggin's alleged bad acts did not create U.S. Coal's obligation to pay his legal fees. The terms of U.S. Coal's own bylaws and charter created this obligation. When Goggin was sued in connection with his conduct as a U.S. Coal director in the CAM lawsuit, the filing of that

lawsuit triggered U.S. Coal's obligation to pay for his defense.  Trustee cites no law for the proposition that a director breaches a fiduciary duty of loyalty to a corporation when exercising a right to indemnity afforded him under that corporation's charter and bylaws related to litigation instituted against him as a director.  As a result, the fact that Goggin took on legal representation for the CAM lawsuit at U.S. Coal's expense did not constitute a breach of his fiduciary duties.

With respect to ECM's representation by NLF in the CAM litigation, the ECM Credit Agreement, which incorporated a term from U.S. Coal's agreement with JMB, required U.S. Coal to indemnify ECM for its attorney's fees in certain circumstances.  [ECF No. 198-10 at § 8.03 ("(a) The Borrower [U.S. Coal] shall pay … (ii) all out-of-pocket expenses incurred by any Lender [here, ECM], including the fees, charges and disbursements of any counsel for such Lender (whether outside counsel or the allocated costs of its internal legal department), in connection with the enforcement, collection or protection of its rights in connection with the Loan Documents, including its rights under this Section, or in connection with the Loan made hereunder…."); ECF No. 197-7 at 10.]  Trustee does not argue that the CAM lawsuit, in which ECM was a named defendant, was not filed "in connection with the Loan" that ECM provided to U.S. Coal.  Trustee also does not explain why this provision in the ECM Credit Agreement should not be enforced as written to require U.S. Coal to pay for ECM's defense of the CAM lawsuit.   Moreover, Trustee does not argue that Goggin breached a fiduciary duty to U.S. Coal merely by choosing to have NLF represent ECM in the CAM lawsuit.

Next, Trustee's claim against Goggin for breach of fiduciary duty based on NLF's representation of ECM in the Kaplan lawsuit is even less clear.  ECM was not a named defendant in the Kaplan lawsuit; ECM engaged NLF and sought to intervene into the lawsuit.  Although the New York state court denied that motion, Trustee does not argue that ECM did not have the right

to seek to intervene in the Kaplan lawsuit.  Trustee does not contend that the terms of the ECM Credit Agreement did not require U.S. Coal to pay ECM's legal fees associated with its participation in the Kaplan lawsuit.  Trustee also does not posit that Goggin breached a fiduciary duty to U.S. Coal by engaging NLF to represent ECM for the Kaplan lawsuit or by having ECM seek indemnity from U.S. Coal for ECM's legal fees.  In truth, Trustee does not offer any argument at all about NLF's involvement in the Kaplan lawsuit to explain why what Goggin did breached a fiduciary duty that he owed to U.S. Coal.

Trustee's main argument regarding NLF's involvement in the Kaplan and CAM lawsuits (aside from the filing of those suits in the first place) appears to be that NLF charged unreasonable fees for its work and that Goggin and ECM did not take steps to prevent NLF from running up "egregious" fees.  On this score, Trustee cites testimony from Collins and Windisch that they believed that NLF's fees were too high.  Trustee also offers an email from Windisch to an NLF lawyer stating that NLF was sending invoices for its work that, on average, exceeded $100,000 per month and charged about three times more for its work than what Nixon Peabody charged to represent U.S. Coal in the CAM lawsuit.  This anecdotal evidence is insufficient to establish that Goggin breached a fiduciary duty to U.S. Coal because U.S. Coal's officers felt that NLF's fees were too high.  Trustee also does not offer any expert opinion evidence for the proposition that NLF's fees were "egregious" or unjustified based on the work NLF performed to represent Goggin and ECM.

For these reasons, Goggin is entitled to a summary judgment in his favor in connection with Trustee's claim regarding the NLF legal fees.

### G. Trustee may continue to pursue Goggin, but not Goodwin, for the issuance of Goggin and Goodwin's 2013 Amended Notes and payments made in connection therewith.

Goodwin and Goggin held unsecured personal notes from U.S. Coal that went into default on February 1, 2012. On October 22, 2012, while still a member of the Board, Goodwin served U.S. Coal with written notices of default on his two personal notes. The next day, Goodwin gave U.S. Coal written notice of his resignation as a director, resulting in a Board with four members (Goggin, Koutsodimitropoulos, Collins, Whitt). Thereafter, Goodwin started to negotiate with Collins and Windisch regarding the defaults.

Goggin did not resign from the Board when Goodwin did. Instead, Goggin agreed with U.S. Coal that, as to the default on his personal notes (which essentially mirrored Goodwin's notes), he would accept a resolution that was identical to whatever terms U.S. Coal negotiated with Goodwin. Thus, Goggin specifically recognized he was "interested" in U.S. Coal's transaction with Goodwin.

Effective February 1, 2013, Goodwin and Goggin's unsecured personal notes were amended and restated into one secured note for each of them (the "2013 Amended Notes"), each with a balance of $1,097,620.03, due on October 31, 2014. Defendants also each received a $175,000 wire transfer on February 12, 2013, pursuant to the 2013 Amended Notes, and each received payments totaling $645,408.58 from U.S. Coal between February 2013 and May 2014. The U.S. Coal Board voted to approve the 2013 Amended Notes on February 11, 2013, with Collins and Whitt voting to approve them, Goggin abstaining, and Koutsodimitropoulos not voting. In other words, of a four-member Board, with one member (Goggin) conflicted on the proposed transaction, only two non-conflicted directors voted on this transaction.

1.    **Goodwin is entitled to a summary judgment concerning the 2013 Amended Notes.**

Trustee contends that Goodwin's conduct amounted to a breach of the fiduciary duty of loyalty insofar as Goodwin's declaration of default on his personal notes occurred while he was still a director.[13]  (She does not argue that Goodwin breached his fiduciary duties to the extent that, after he left the Board, U.S. Coal made payments pursuant to the 2013 Amended Notes.) Trustee did not move for summary judgment on her fiduciary duty claim against Goodwin in connection with the 2013 Amended Notes, but Goodwin seeks a summary judgment that he is not liable for this conduct.

Trustee has not established that Goodwin's decision to provide written notice of default on his personal notes at or around the time he resigned from the Board amounted to a breach of his fiduciary duties to U.S. Coal.  There is no material dispute of fact that Goodwin's personal notes were in default when he tendered written notice of default and resigned in October 2012. There also is no dispute that, upon leaving the Board, Goodwin no longer owed fiduciary duties to U.S. Coal and had the right to negotiate with its executives with respect to the default on his personal notes, resulting in new terms being reached in February 2013.  Long-standing Delaware law makes plain that directors need not forego rights as a creditor to their detriment:

> While the law requires that corporate fiduciaries observe high standards of fidelity and, when self-dealing is involved, places upon them the burden of demonstrating the intrinsic fairness of transactions they authorize, the law does not require more than fairness. Specifically, it does not, absent a showing of culpability, require

---

[13] Trustee contends that "on October 22, 2012, while still a director, Goodwin served U.S. Coal with a notice of default for his personal note and threatened to push the company into bankruptcy unless his note was repaid. (Notice of Default dated Oct. 22, 2012, TX 83; Goggin Mem. at 37-38, ¶5)."  [ECF No. 231 at 4; *see also* ECF No. 200 at 40 ("on October 22, 2012, while still a director, Goodwin served U.S. Coal with a notice of default for his personal note and threatened to push the Company into bankruptcy unless his note was repaid. (Notice of Default dated October 22, 2012, attached as Ex. 83.)"]  The Court notes that neither of the statements in Trustee's briefs cite to evidence in the record that, on October 22, 2012, while still a director, Goodwin threatened to push U.S. Coal into bankruptcy unless his personal notes were repaid.

that directors or controlling shareholders sacrifice their own financial interest in
the enterprise for the sake of the corporation or its minority shareholders.

*Jedwab v. MGM Grand Hotels, Inc.*, 509 A.2d 584, 598 (Del. Ch. 1986); *see also Odyssey*

*Partners L.P. v. Fleming Cos.*, No. 14770, 1996 Del. Ch. LEXIS 91, at *10-11 (Del. Ch. July 24,

1996) ("fiduciary obligation does not require self-sacrifice.  More particularly, it does not

necessarily impress its special limitation on legal powers held by one otherwise under a fiduciary

duty, when such collateral legal powers do not derive from the circumstances or conditions

giving rise to the fiduciary obligation in the first instance.  Thus, one who may be both a creditor

and a fiduciary (e.g., a director or controlling shareholder) does not by reason of that status alone

have special limitations imposed upon the exercise of his or her creditor rights." (citations

omitted)).  Goodwin is entitled to a summary judgment on Trustee's fiduciary duty claim based

on the 2013 Amended Notes.

> **2.    Goggin must establish at trial that the transaction related to the 2013
> Amended Notes was entirely fair.**

Both Goggin and Trustee seek a summary judgment on Goggin's fiduciary duty liability

related to both U.S. Coal's entry into and payments on the 2013 Amended Notes.  Trustee

contends that Goggin breached his fiduciary duty of loyalty to U.S. Coal by:  (a) involving

himself in an interested transaction to help himself and Goodwin move ahead of other unsecured

creditors when they knew U.S. Coal was in financial crisis, thereby causing the conversion of

their notes from unsecured to secured, and (b) causing payments on the converted notes from

February 2013 to the eve of bankruptcy when other creditors were not being paid.  Trustee seeks

to recover rescissory damages totaling $1,290,817.16 from Goggin based on payments that he

and Goodwin received on the 2013 Amended Notes.  Trustee also demands legal fees from

Goggin for this purported breach.  The analysis with respect to the 2013 Amended Notes differs

significantly as between Goggin and Goodwin.

Goggin indisputably agreed with U.S. Coal executives that he would "take the same deal" offered to Goodwin with respect to curing the default on his personal notes. Therefore, as Goggin recognized, any agreement U.S. Coal reached with Goodwin also impacted Goggin. While Goggin posits that "Collins and Windisch negotiated only with Goodwin to refinance the" personal notes, this contention is misleading at best. [ECF No. 191-1 at 39.] In fact, Trustee offers several written communications involving Goggin, testimony from CFO Windisch, and Goggin's own testimony to support her contention that Goggin did not actually recuse himself from the negotiations between U.S. Coal and Goodwin related to the 2013 Amended Notes.

Goggin agreed that he was "advocating for restructuring Goodwin's notes while [Goggin was] on the board." [ECF No. 202-5 at 278; *see also* 205-8 at 38.] He also communicated on several occasions with U.S. Coal's other directors and its officers regarding the negotiations with Goodwin and potential alternatives to restructuring the personal notes. Goggin's conduct did not constitute a recusal from the negotiations, notwithstanding the fact that Goggin did not ultimately vote to approve the issuance of the 2013 Amended Notes. *See*, *e.g.*, *Valeant Pharm. Int'l v. Jerney*, 921 A.2d 732, 753–54 (Del. Ch. 2007) ("Generally speaking, a director who does not attend or participate in the board's deliberations or approval of a proposal will not be held liable. This is not an invariable rule and the result may differ where the absent director plays a role in the negotiation, structuring, or approval of the proposal."). Goggin offers no evidence (expert or otherwise) or argument to refute Trustee's evidence and expert opinions that Goggin's involvement in the transaction before its approval did not amount to a proper recusal.

In addition, on February 11, 2013, only two non-interested directors (Collins, Whitt) of the four-member Board voted in favor of restructuring Defendants' notes, while Goggin and one non-interested director (Koutsodimitropoulos) did not vote on that transaction. [ECF No. 208-

13.[14]] Therefore, an independent majority of the Board did not vote to approve the 2013 Amended Notes. "To obtain review under the entire fairness test, the … plaintiff must prove that there were not enough independent and disinterested individuals among the directors making the challenged decision to comprise a board majority." *Trados*, 73 A.3d at 44-45 (citing *Aronson*, 473 A.2d at 812).

Finally, Goggin remained on the Board for about one year after the issuance of the 2013 Amended Notes and while payments on those Notes were being made. Trustee tendered evidence that Goggin and Goodwin were paid pursuant to the 2013 Amended Notes at a time when other creditors were not being paid on their debts.

For these reasons, Goggin's motion for summary judgment is denied. Trustee's cross-motion also is denied; however, she established that Goggin is not entitled to the benefit of the business judgment rule in connection with Trustee's contentions regarding the 2013 Amended Notes. At trial, Goggin must demonstrate the entire fairness of the transaction relating to the 2013 Amended Notes and the resulting payments thereon.

### H. Trustee may continue to pursue Goggin for U.S. Coal's loss of its line of credit from Commercial Bank.[15]

U.S. Coal had a line of credit with Commercial Bank, which it used to pay debts in the ordinary course of business. U.S. Coal's other lenders, including ECM, agreed to subordinate their interests to that of Commercial Bank via a subordination agreement, which Commercial Bank required to extend the line of credit. However, Commercial Bank allowed the subordination agreement to lapse without obtaining an extension. When this occurred, creditors,

---

[14] Neither Trustee nor Goggin has provided an executed copy of the minutes of the February 11, 2013 Board Meeting, though both have cited to the unsigned minutes to support their arguments without objection. The Court therefore concludes there is no material dispute of fact about the substance of the tendered minutes.

[15] Trustee does not contend that Goodwin is liable in connection with this alleged misconduct. He was not on the Board at the time of this transaction.

including ECM, automatically assumed their former priority positions. U.S. Coal asked ECM to agree again to subordinate its debt to Commercial Bank's line so that Commercial Bank would extend the line of credit. But in January 2014, acting through Goggin as its manager, ECM refused to subordinate its interest to the line of credit. Goggin, a U.S. Coal director at that time, understood that the result of ECM's refusal to subordinate would be that Commercial Bank would no longer extend the line of credit and U.S. Coal would have to repay millions of dollars to Commercial Bank, depleting its cash reserves. After it lost the line of credit, U.S. Coal stopped paying most of its trade obligations, which ballooned in 2014. Trustee contends that Goggin's conduct amounted to a breach of his fiduciary duties to U.S. Coal. Goggin has moved for a summary judgment with respect to this challenged action; Trustee did not move for a judgment in her favor on this issue.

Goggin contends that U.S. Coal did not actually lose the line of credit until on or about February 25, 2014, after he resigned from the Board on February 3. Thus, he did not owe a fiduciary duty to U.S. Coal at the time it lost the line of credit. In addition, Goggin argues that ECM had no obligation to subordinate or waive its rights to favor Commercial Bank, and therefore ECM was legally permitted to refuse to subordinate ECM's position, regardless of the impact on U.S. Coal. The Court rejects both arguments.

First, there is no dispute that Goggin, acting on behalf of ECM, refused to subordinate ECM's interest in January 2014 while he was a U.S. Coal director. Only after Goggin rejected U.S. Coal's request for ECM to subordinate did he resign as a director. By the time he resigned, it was inevitable that Commercial Bank would not renew its line of credit. Thus, the alleged misconduct occurred in January 2014, when Goggin, who was a dual fiduciary with a conflict of interest, admittedly chose to protect the interests of one of his principals (ECM) to the detriment

of the other (U.S. Coal). Stated differently, Goggin owed a fiduciary duty to U.S. Coal at the time he caused ECM to refuse to subordinate its interest, and his first argument lacks merit.

Second, Goggin's contention about ECM's rights as a creditor is misguided. Goggin may have been ECM's manager, but Goggin and ECM were separate legal entities with different rights and duties. ECM's obligations to U.S. Coal and its legal rights as a creditor are not at issue here. What is at issue is that Goggin owed fiduciary duties to U.S. Coal in January 2014. Trustee contends that Goggin breached his fiduciary duties to U.S. Coal by preferring the interests of one entity to which he owed fiduciary duties over the other when the entities' interests were not aligned. Therefore, Goggin's argument that he merely was exercising ECM's rights misses the point entirely. Goggin's motion for summary judgment in connection with this transaction is denied.

## **CONCLUSION**

The foregoing constitutes the Court's findings of fact and conclusions of law as to Count 7 of Trustee's First Amended Complaint. Pursuant to 28 U.S.C. § 157(c)(1) and Federal Rule of Bankruptcy Procedure 9033(a), the Court RECOMMENDS that the District Court enter a judgment consistent herewith.

---

**The affixing of this Court's electronic seal below is proof this document has been signed by the Judge and electronically entered by the Clerk in the official record of this case.**



**Signed By:**
**_Tracey N. Wise_**
**Bankruptcy Judge**
**Dated: Wednesday, March 27, 2019**
**(tnw)**